**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

M.R., by her parent and next friend, L.R., *et al.*,

              Plaintiffs,

     v.

District of Columbia,

              Defendant.

Civil Action No. 25-0556 (CKK)

**MEMORANDUM OPINION**
(July 15, 2026)

A student using the pseudonym "M.R." and her parent "L.R." (collectively, the "Plaintiffs") filed this action against the District of Columbia ("Defendant") to appeal an administrative decision relating to the student's publicly funded placement at the Lab School of Washington ("Lab School"), a private school that serves students with disabilities.[1]  Shortly after filing their complaint in this action, Plaintiffs filed a motion for a preliminary injunction to secure the student's placement at the Lab School until the case was resolved.  *See* Pls.' Mot., ECF No. 10.  That motion for preliminary injunction was resolved in favor of the Plaintiffs.  *See* Order, ECF No 18; Mem. Op., ECF No. 19.

Pending before this Court is Plaintiffs' [22] Motion for Summary Judgment and Defendant's [25] Cross-Motion for Summary Judgment, which are both fully briefed.  Upon

---

[1] On March 21, 2025, immediately prior to this case being randomly assigned to the undersigned, Chief Judge James Boasberg granted the Plaintiffs' Motion to Proceed Under Pseudonym.  *See* Mem. Op. and Order, ECF No. 4.

consideration of the parties' submissions,[2] the relevant legal authority, and the entire record, and

for the reasons explained herein, the Court shall **DENY** Plaintiffs' Motion for Summary

Judgment and **GRANT** Defendant's Cross-Motion for Summary Judgment.

## I. BACKGROUND[3]

### A. IDEA Eligibility

M.R., who is seventeen years old, is a student in this District who has been diagnosed

with specific learning disabilities in reading, math, and written expression. Compl., ECF No. 1,

¶¶ 4, 6–7; *see* June 2017 Hearing Officer Determination ("HOD"), AR1, ECF No. 21-1, at 182.[4]

M.R. began her public education at a D.C. public school, where she repeated kindergarten. *See*

February 2025 HOD, AR1 at 10. In March 2016, when M.R. was in first grade, District of

Columbia Public Schools ("DCPS") determined that she was eligible for special education

services under the Individuals with Disabilities Education Act ("IDEA"). *See* June 2017 HOD,

---

[2] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto:
- Plaintiffs' Complaint ("Compl."), ECF No. 1;
- Administrative Record ("AR"), ECF No. 21;
- Plaintiffs' Motion for Summary Judgment ("Pls.' Mot."), ECF No. 22;
- Defendant's Combined Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Def.'s Cross-Mot."), ECF Nos. 25-26;
- Plaintiffs' Combined Opposition to the Defendant's Cross-Motion and Reply in Support of Plaintiffs' Motion ("Pls.' Reply"), ECF Nos. 27-28; and
- Defendant's Reply in Support of its Cross-Motion ("Def.'s Reply"), ECF No. 29.

In an exercise of its discretion, the Court concludes that oral argument is not necessary to resolve the issues pending before the Court. *See* LCvR 7(f).

[3] The Court borrows liberally from the Background section in its memorandum opinion on the motion for preliminary injunction, ECF No. 19.

[4] Throughout this Memorandum Opinion, all citations, including citations to the Administrative Record ("AR"), refer to the automatic pagination in the ECF system, rather than to any internal pagination of the exhibits or the documents contained therein. Because the AR is divided into 4 sections, as docketed, the Court refers to it as AR1 [corresponding to ECF No. 21-1], AR2 [ECF No. 21-2], AR3 [ECF No. 21-3], and AR4 [ECF No. 21-4], for clarity.

AR1 at 181-182; Pls.' August 2020 Due Process Complaint, AR3 at 264.  In consultation with M.R.'s mother, L.R., DCPS developed an initial Individualized Education Program ("IEP") for M.R. that called for her to receive 90 minutes of specialized instruction each week, in addition to general education and English language learner (ELL) services.  June 2017 HOD, AR1 at 182.  DCPS immediately began implementing M.R.'s IEP at her public elementary school.  *Id.* at 182–183.

### B. 2016-2017 School Year

At the beginning of the 2016-2017 School Year, L.R. enrolled M.R. at the Lab School, a private school that provides full-time special education services to students with disabilities. Compl. ¶¶ 6, 9; June 2017 HOD, AR1 at 186; *see also* AR1 at 177 (noting that Plaintiffs requested DCPS's reimbursement for M.R.'s unilateral placement at the Lab School for the 2016-2017 School Year).  DCPS did not agree to pay for the cost of M.R.'s attendance at the Lab School because it contended that the IEP prepared in March 2016 had offered M.R. a free appropriate public education ("FAPE") that could be delivered at a public elementary school. *See* June 2017 HOD, AR1 at 177.

DCPS completed a new IEP for M.R. in March 2017.  *See id.* at 187-188.  This IEP proposed 10 hours of specialized instruction for M.R. each week, along with additional hours of occupational therapy and speech-language therapy.  *Id.*  L.R. objected to this IEP, arguing that M.R.'s educational program should include a greater amount of specialized instruction and that all services should be provided outside of the general education context.  *Id.*

### 1. HOD re: March 2016 and March 2017 IEPs

L.R. filed an administrative due process complaint arguing that DCPS had denied M.R. a FAPE for the 2016-2017 School Year by not proposing adequate IEPs in either March 2016

or March 2017.  *See* June 2017 HOD, AR1 at 175-177.  As a remedy for that violation, L.R. sought reimbursement of the cost of M.R.'s attendance at the Lab School for the 2016-2017 School Year.  See *id.*

On review of L.R.'s complaint regarding the 2016-2017 School Year, Hearing Officer Peter Vaden ("Hearing Officer Vaden") found that although M.R. may not require "segregation from her nondisabled peers for the entire school day," there was persuasive evidence that M.R. "needs to be in a small classroom setting for at least her academic subjects" so that she can be "less distracted" and be "assured individualized support."  June 2017 HOD, AR1 at 196-197. After weighing the parties' evidence, the Hearing Officer concluded that the March 2017 IEP did not offer M.R. a FAPE because it did not provide sufficient small-group instruction.  *Id.* at 197.  Hearing Officer Vaden also concluded that the Lab School was an appropriate placement for M.R., that L.R. had not acted unreasonably by contesting the March 2017 IEP and sending M.R. to the Lab School, and that the equities weighed in favor of reimbursing the cost of M.R.'s attendance at the Lab School after the date of the IEP that he found had failed to offer her a FAPE.  *Id.* at 197-199.

However, Hearing Officer Vaden concluded also that M.R.'s previous IEP, which was completed in March 2016, had not denied M.R. a FAPE.  Vaden opined that the appropriateness of an IEP depended on the information available at the time it is offered to the student.  *See* June 2017 HOD, AR1 at 193; *see also Edward M.R. v. District of Columbia*, 128 F.4th 290, 294 (D.C. Cir. 2025) (explaining that courts "evaluate IEPs' substantive adequacy 'as of the time each IEP was created rather than with the benefit of hindsight'" (quoting *Z.B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018)).  Hearing Officer Vaden noted that DCPS had limited information in March 2016 about M.R.'s specific need for a small classroom environment and

that L.R. had not initially raised any concerns about the proposed IEP.  June 2017 HOD, AR1 at 194-195.  Under those circumstances, Hearing Officer Vaden concluded that DCPS did not deny M.R. a FAPE by not revising the March 2016 IEP before the beginning of the 2016–2017 School Year.  *Id.*

Accordingly, Hearing Officer Vaden found that L.R. was entitled to reimbursement for the cost of M.R.'s education at the Lab School after the date of the March 2017 IEP through the end of the 2016–17 School Year.  *Id.* at 199; *see also Leggett v. District of Columbia*, 793 F.3d 59, 66–67 (D.C. Cir. 2015) (explaining criteria for deciding when reimbursement of the costs of attending a private school is a proper remedy for failure to provide a FAPE).  Hearing Officer Vaden also directed DCPS to convene M.R.'s IEP team "as soon as practicable" to review and revise her IEP to ensure that "all of [her] academic courses, with the exception of specials such as art and music, . . . be provided in a small classroom setting, outside general education."  June 2017 HOD, AR1 at 199-200.

**2. Appeal of Hearing Officer's June 2017 Decision**

L.R. and M.R. appealed the adverse parts of Hearing Officer Vaden's June 2017 decision by filing a civil action against the District of Columbia in the District Court, urging the court to find that the March 2016 IEP had not offered M.R. a FAPE and requesting reimbursement of the entire cost of M.R.'s attendance at the Lab School during the 2016-2017 School Year.  *See* Compl., *M.R. v. District of Columbia*, No. 17-cv-1565 (D.D.C. filed Aug. 2, 2017).  During this appeal, DCPS agreed to a "stay-put" at the Lab School for the 2017-2018 School Year, recognizing that the Lab School was M.R.'s "current school" at that time.  *See* September 27, 2017 e-mail from DCPS counsel confirming stay-put, AR3 at 227.

The Honorable James E. Boasberg referred consideration of this matter to Magistrate Judge G. Michael Harvey for a Report and Recommendation. Magistrate Judge Harvey recommended that the District Court affirm Hearing Officer Vaden's conclusion that the March 2016 IEP had provided M.R. with a FAPE and deny Plaintiffs' request for reimbursement for the cost of M.R.'s education at the Lab School for the several months of the 2016–2017 School Year that preceded the March 2017 IEP. *See* Report and Recommendation, *M.R. v. District of Columbia*, No. 17-cv-1565, ECF No. 22 (D.D.C. July 6, 2018) (GMH) (AR1 at 205-242). Judge Boasberg adopted Magistrate Judge Harvey's Report and Recommendation in full and entered judgment in favor of the District. *See M.R. v. District of Columbia*, No. 17-cv-1565, ECF No. 23 (D.D.C. July 23, 2018) (JEB) (AR1 at 270-271).

### C. 2018-2019 School Year

In August 2018, L.R. notified DCPS that she intended to keep M.R. at the Lab School for the 2018-2019 School Year and requested that DCPS fund her placement there. *See* October 24, 2018 Stay-Put Order, AR1 at 295-298. DCPS declined. *See id.* L.R. requested an administrative hearing and invoked M.R.'s "stay-put" rights. *Id.* DCPS opposed the "stay-put" request, arguing that the Lab School was no longer M.R.'s "current educational placement." *Id.* Hearing Officer Keith Seat concluded that M.R. was entitled to a "stay-put" order maintaining her placement at the Lab School during the pendency of her administrative challenge to DCPS's decision not to fund that placement for the 2018-2019 School Year. *Id.* at 298. The parties eventually reached a settlement agreement in which DCPS agreed to fund M.R.'s placement at the Lab School through the end of the 2018-2019 School Year. *See* April 23, 2019 Offer of Settlement. AR1 at 299-300.

**D. 2019-2020 School Year**

Essentially the same pattern recurred the following school year. In August 2019, L.R. notified DCPS that she intended to keep M.R. at the Lab School for the 2019-2020 School Year, asked that DCPS fund that placement, and invoked M.R.'s "stay-put" rights. *See* November 19, 2019 Interim Stay-Put Order, AR1 at 328-329. DCPS declined and opposed the "stay-put" request. *See id.* at 330. Hearing Officer Michael Lazan agreed with L.R. that the Lab School was M.R.'s "current educational placement" and ordered that DCPS maintain her placement there until the administrative challenge was resolved. *Id.* at 336. In June 2020, the parties reached a settlement agreement resolving L.R.'s administrative complaint regarding the 2019-2020 School Year. *See* June 11, 2020 Offer of Settlement, AR1 at 411-413.

**E.  2020-2021 School Year**

A similar pattern unfolded yet again during the 2020-2021 School Year. L.R. notified DCPS in August 2020 that she intended to keep M.R. at the Lab School, requested funding for that placement, and invoked M.R.'s "stay-put" rights. *See* August 2020 Due Process Complaint, AR3 at 259-270; September 30, 2020 Stay-Put Order, AR3 at 271-272. DCPS declined and opposed the "stay-put" request. *See id.* at 275. Hearing Officer Peter Vaden ordered DCPS to maintain M.R.'s placement at the Lab School pending resolution of the administrative challenge to its decision not to fund her placement there for the full 2020-2021 School Year. *Id.* at 276. At L.R.'s request, Vaden later dismissed the administrative complaint as moot, in May 2021, concluding that there was no longer any "effectual relief" that the administrative process could provide. *See* May 6, 2021 Dismissal Order, AR3 at 318-319.

Shortly after Hearing Officer Vaden dismissed L.R.'s complaint regarding placement for the 2020-2021 School Year, DCPS notified Plaintiffs that it did not intend to maintain M.R.'s

7

placement at the Lab School following the date of Hearing Officer Vaden's decision. *See* May 7, 2021 e-mails re: status of tuition payments, AR3 at 322-323. L.R. then filed yet another administrative complaint and argued that M.R. was entitled to a "stay-put" order preserving her placement at the Lab School through the end of the 2020-2021 School Year. May 2021 Due Process Complaint, AR3 at 325-330. On June 28, 2021, Hearing Officer Vaden concluded that the Lab School continued to be M.R.'s "current educational placement" and ordered DCPS to maintain that placement through the end of the 2020–2021 School Year. June 28, 2021 Decision and Order on Stay-Put, AR3 at 336-338.

### F. 2021-2022 School Year

DCPS developed a new IEP for M.R. in April 2021. *See* April 2021 IEP, AR2 at 1-36; February 2025 HOD, AR1 at 11. The IEP team recommended a program including 20 hours per week of specialized instruction, three hours per month of occupational therapy services, four hours per month of speech-language pathology services, and two hours per month of behavioral support services, all to be delivered outside of the general education setting. April 2021 IEP, AR2 at 27.

L.R. and DCPS cross-filed administrative complaints regarding the appropriateness of DCPS's proposed placement for M.R. for the 2021-2022 School Year, and these cases were consolidated for hearing. *See* Prehearing Order, AR3 at 339-340. L.R. again argued that M.R. should be placed at the Lab School and requested a "stay-put" order preserving her status there. *See id.* at 340, 343. DCPS opposed those requests and sought a ruling that a public middle school placement it had proposed for the 2021-2022 School Year based on the April 2021 IEP was appropriate. *See id.* Hearing Officer Vaden again granted L.R.'s request for a "stay-put" order. *See id.* at 343. But after holding an  administrative due process hearing, in October 2021,

Hearing Officer Vaden concluded that the April 2021 IEP and DCPS's proposed placement at a public middle school were appropriate, meaning that DCPS had offered M.R. a FAPE and that it was therefore not required to continue to fund her placement at the Lab School.  October 2021 HOD, AR3 at 375.

**1. Appeal of Hearing Officer's October 2021 Decision**

L.R. and M.R. appealed to the District Court regarding Hearing Officer Vaden's October 2021 HOD.  *See* Compl., *M.R. v. District of Columbia*, Case No. 21-cv-2990, ECF No. 1 (D.D.C. filed Nov. 12, 2021).  Plaintiffs filed a motion for a preliminary injunction to secure M.R.'s "stay-put" rights pending resolution of the appeal.  *See* Mot. for Prelim. Injunction, Case No. 21-cv-2990, ECF No. 3.  DCPS did not oppose the motion, and accordingly, the Honorable Tanya S. Chutkan granted the unopposed motion, declared that the Lab School was M.R.'s "current educational placement," and ordered that DCPS maintain her placement there pending resolution of the appeal.  *See* December 3, 2021 Minute Order, Case No. 21-cv-2990.

The parties then filed cross-motions for summary judgment, which Judge Chutkan referred to Magistrate Judge Robin M. Meriweather for a Report and Recommendation.  *See* December 11, 2021 Minute Order.  Magistrate Judge Meriweather recommended that each party's motion be granted in part and denied in part.  More specifically, she recommended partial summary judgment to DCPS on the following issues: witness credibility; whether M.R. was entitled to full-time specialized instruction in all classes; the Parent's "participation" claim; the appropriateness of the public school as a placement; and examining the proper IEP.  Magistrate Judge Meriweather recommended partial summary judgment to Plaintiffs insofar as the case would be remanded to the Hearing Officer for further proceedings on whether the IEP should have included certain goals related to reading, including a goal related to phonetic awareness,

as well as to reconsider whether L.R. was entitled to reimbursement of the cost of M.R.'s attendance at the Lab School. *See* Report and Recommendation, *M.R. v. District of Columbia*, Case No. 21-cv-2990 (D.D.C. Sept. 11, 2023) (RMM) (AR2 at 335-376). Judge Chutkan adopted the Report and Recommendation in full. *See* Order, *M.R. v. District of Columbia*, Case No. 21-cv-2990, ECF No. 20 (D.D.C. Oct. 16, 2023) (TSC) (AR2 at 501-502).

On remand from the District Court to Hearing Officer Vaden, L.R. argued that the case was moot and should be dismissed because DCPS had already paid off M.R.'s Lab School expenses for the 2021-2022 School Year. *See* Prehearing Order on Remand, AR2 at 506. DCPS opposed dismissal and urged the Hearing Officer to render a decision on the merits. *Id.* Hearing Officer Vaden concluded that the District Court should decide the mootness issue and deferred further proceedings pending action by the District Court. *Id.* at 508-507. L.R. then filed a motion to dismiss the District Court case as moot, which was unopposed by DCPS and granted by Judge Chutkan in July 2024. *See* Order, *M.R. v. District of Columbia*, No. 21-cv-2990 (D.D.C. July 23, 2024), AR2 at 611. Hearing Officer Vaden dismissed the associated administrative proceedings shortly thereafter. *See* Administrative Dismissal Order, AR2 at 612-613.

### G. 2023 and 2024 IEPs

Meanwhile, DCPS developed a new IEP for M.R. in September 2023. *See* IEP, AR2 at 435-493; February 2025 HOD, AR1 at 16. This IEP called for M.R. to receive 20 hours per week of specialized instruction outside of the general education setting, three hours per month of occupational therapy, and three hours per month of behavioral support services. *Id.* It also called for the use of a variety of assistive devices and other interventions designed to help M.R. succeed in the classroom. February 2025 HOD, AR1 at 16-17. The next year, in September

2024, DCPS developed a similar IEP for M.R. that called for the same services, with the addition of one hour per week with a special education case manager. *Id.* at 17-18.

The Lab School also developed its own IEP for M.R., which called for 32 hours per week of specialized instruction, three hours per month of occupational therapy, and six hours per month of speech-language pathology, all to be delivered outside of the general education setting. *Id.* at 17.

### H. 2023-2024 and 2024-2025 School Years

On July 26, 2024 – the same day that Hearing Officer Vaden dismissed the administrative proceedings regarding DCPS's proposal for the 2021-2022 School Year, *see* Administrative Dismissal Order, AR2 at 612-613 – L.R. filed a Due Process Complaint requesting an administrative hearing regarding DCPS's proposals for the 2023-2024 and 2024-2025 School Years, once again invoking M.R.'s "stay-put" rights. *See* September 18, 2024 Stay-Put Order, AR3 at 140-141. L.R. filed a motion to maintain her placement at the Lab School pending the resolution of the administrative challenge. *See id.* at 141. DCPS did not agree to recognize the Lab School as M.R.'s "stay-put" placement, but Hearing Officer Michael Lazan granted the "stay-put" motion in September 2024, concluding that the Lab School was M.R.'s "current educational placement." *Id.* at 141, 147.

L.R. later withdrew and refiled her administrative hearing request to incorporate additional issues that had arisen since her original filing. *See* September 24, 2024 e-mails from counsel, AR3 at 498-499. She also filed a renewed motion to enforce M.R.'s "stay-put" rights to placement at the Lab School, which Hearing Officer Lazan granted in an October 31, 2024 Order on Motion for Stay-Put Relief, AR3 at 598-603. After an administrative hearing that lasted five days and included testimony from 10 witnesses, Hearing Officer Lazan denied in full

L.R.'s request for relief, concluding that DCPS had offered M.R. a FAPE during the 2024-2025 School Year. February 2025 HOD, AR1 at 21-34.

In February 2025, L.R. and M.R. filed this civil action against the District of Columbia to appeal from Hearing Officer Lazan's HOD. *See* Compl., ECF No. 1. As noted previously, Plaintiffs moved for a preliminary injunction to preserve M.R.'s "stay-put" placement at the Lab School until this case is resolved, which was granted by this Court. *See* Order, ECF No. 18. Below, the Court summarizes the administrative proceeding underlying this civil action.

**1. Administrative Proceedings re: 2024-2025 School Year**

Plaintiffs' September 24, 2024 due process complaint alleged that DCPS denied M.R. a FAPE by: (1) failing to propose an appropriate IEP and/or location of services for the 2024-2025 School Year; (2) failing to propose a location of services for her for the 2024-25 School Year as of the date of the filing of this hearing request; (3) continuing to describe her on her IEP as an English Language Learner student; and (4) failing to find her eligible for speech/language services. Due Process Complaint, AR3 at 160-161 (also noting the question as to whether the Lab School was a proper placement). By way of relief, L.R. requested that "DCPS fund [M.R.] at the Lab School of Washington for the 2024-2025 School Year, with all related fees and costs," due to its alleged "failure to propose an appropriate IEP and placement." *Id.* at 160.

An October 8, 2024 resolution meeting did not result in a settlement, and on November 19, 2024, DCPS filed its due process complaint, seeking a ruling that DCPS did not deny the M.R. a FAPE for the 2024-2025 School Year.[5] February 2025 HOD, AR1, at 5-6, 9. On December 3-4, 2024, and January 6-7 and 21, 2025, the parties proceeded to the due process

---

[5] The due process complaints were consolidated in one case by the Hearing Officer. HOD, AR1 at 6.

hearing phase as contemplated by 20 U.S.C. § 1415(f)(1)(A) and (f)(1)(B). Both sides produced exhibits and provided testimony concerning the issues raised in the Due Process Complaints. Below, the Court discusses in brief the witnesses.

### a.  Due Process Hearing Witnesses

In addition to M.R.'s parent, L.R., Plaintiffs' witnesses consisted of: (1) Audrey Dolginoff, a director at the Lab School, who was qualified as an expert in special education ("Witness A"); (2) Gretchen Kunz, a speech-language pathologist, who was qualified as an expert in speech-language pathology and literacy ("Witness B"); (3) Laura Solomon, M.R.'s educational  consultant, who was qualified as an expert in special education ("Witness C").

Ms. Dolginoff testified that she had been M.R.'s case manager for M.R.'s IEP for the last three years and she had observed her but not worked with her directly.  AR4 at 235-236, 241. Ms. Kunz indicated that she was the director of speech, language and literacy at the Lab School, where she managed a team of speech language pathologists.   AR4 at 301, 303.  Ms. Kunz did not directly provide these services to M.R., but she had substituted a few times during speech and language sessions when M.R.'s clinician was not there.  AR4 at 307.  Ms. Solomon explained that, among other credentials, she holds a doctorate in special education, and she served as an adjunct professor for several years at universities in their master's level teacher training programs.  AR4 at 512, 513.  In 1983, she opened a private practice providing consultation services to families with students with educational disabilities in the District of Columbia metropolitan area.  *Id.* at 515.

DCPS's witnesses consisted of: (1) Sean Bradley, a DCPS monitoring specialist who was qualified as an expert in special education with an emphasis on non-public placement ("Witness D"); (2) Delissa Green, a speech-language pathologist, who was qualified as an expert in speech-

language pathology programming and evaluations ("Witness E"); (3) Rosanna DeMammos, a deputy chief with DCPS, who was qualified as an expert in English language learner ("ELL") testing and services ("Witness F"); (4) Selena Barlow, a DCPS manager, who was qualified as an expert in special education programming and placement and reading ("Witness G"); (5) Lori Easterly, a DCPS program specialist, who was qualified as an expert in special education programming and placement with an emphasis on private placement ("Witness H"); (6) Crystal Millington, a DCPS program manager, who was qualified as an expert in special education programming and placement with an emphasis on full-time placement ("Witness I"); and (7) Devon Wade, a DCPS director, who was qualified as an expert in special education ("Witness J").

Mr. Bradley indicated that he was the monitoring specialist on the non-public team at DCPS, where he monitored DCPS students with disabilities who were funded by DCPS to attend special education day schools, and in this capacity, he oversaw six non-public schools, including the Lab School. AR4 at 398. Mr. Bradley explained that he observed students at the schools, set up their transportation, reviewed their progress reports and attendance, and he acted as the LEA representative for DCPS at the IEP meetings at the non-public schools for the previous four years. *Id.* Ms. Green stated that she had been a speech-language pathologist on the central IEP team [officially] since 2015, but she had been a speech and language pathologist with DCPS for 26 years, and her main role was doing assessments. AR4 at 435-436. Ms. DeMammos indicated that she was the deputy chief of the Lanaguage Acquisition Division which supported all multilingual learners or English learners in DCPS. AR4 at 572. Ms. DeMammos supervised a team that supported over 8,000 multilingual learners or English learners in grades preschool 3 through grade 12 and in the opportunity academies. AR4 at 574.

Ms. Barlow testified that, since March of 2021, she had managed the Central IEP team – a 13-person assessment team for students who attend private schools – to make sure that Child Find obligations were being met.  AR4 at 598-599.  Prior to that, she was a non-public monitoring specialist for DCPS, where she monitored students whom DCPS had placed at various non-public schools to make sure that their IEPs were being implemented.  AR4 at 599. Ms. Easterly testified that she was the program specialist with the CIEP team, which is the central office IEP team, and that her position involved facilitating and leading IEP meetings and eligibility meetings and conducting observations, while working with private and parochial schools as well as DCPS.  AR4 at 651.  In her position, Ms. Easterly worked with Lab School frequently.  *Id.*  Ms. Millington testified that she was the program manager for DCPS special education classrooms.  AR4 at 702.  More specifically, she managed the self-contained classrooms - the learning support classrooms and behavior and education support classrooms to ensure that there was appropriate allocation of staff and supports.  AR4 at 707.  Ms. Wade indicated that she was the director of specialized education at Jackson-Reed High School ("Jackson-Reed") and in that capacity, she sat in as the LEA representative designee for all IEP eligibility meetings, oversaw case managers, conducted classroom observations, and acted as liaison between central service and the school.[6]  AR4 at 739.

### b. HOD

On February 13, 2025, Hearing Officer Lazan issued his HOD, in which he addressed each of the issues raised by the Plaintiffs' regarding the alleged denial of a FAPE, as well as DCPS's position that there was no denial of FAPE.  After making his findings of fact, AR1 at 9-21, Hearing Officer Lazan set forth his conclusions of law that: (1) "DCPS offered [M.R.] a

---

[6] Jackson-Reed was the location of services designated by DCPS.

FAPE through its IEPs corresponding to the 2024-2025 school year" [AR1 at 29]; (2) L.R.'s claim that a FAPE was denied when DCPS failed to propose a location of services for the 2024-2025 School Year by the date of the filing of the hearing request was not raised "in her closing brief," and furthermore, this claim was deemed to be "without merit" [*id.* at 30] ; (3) L.R.'s claim that M.R. continued to be described as an ELL was "not mentioned in the Parent's brief [and] must be dismissed" [*id.* at 31]; and (4) L.R.'s claim that M.R. was denied a FAPE when she was not found eligible for speech/language was rebutted by Ms. Green's testimony and accordingly, that claim was dismissed [*id.* at 32].  The Hearing Officer concluded also that DCPS offered M.R. a FAPE during the 2024-2025 School Year, and he dismissed Plaintiffs' case with prejudice.  *Id*. at 32.

The Court turns now to the applicable legal standards regarding review of the Hearing Officer's decision, in the context of the parties having filed the cross-motions for summary judgment, which are before this Court.

## II. LEGAL STANDARD

### A. IDEA

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, provides federal funding to the District of Columbia, States, and United States territories for public education, subject to certain conditions.  First, recipients of federal funding must ensure that a "free appropriate public education is available to all children with disabilities."  *See* 20 U.S.C. § 1412(a)(1).  The "free appropriate public education" required by this condition is commonly known as a "FAPE."  Second, children with disabilities must, "[t]o the maximum extent appropriate," be "educated with children who are not disabled" and "remov[ed] . . . from the regular educational environment . . . only when the nature or severity of the disability of [the] child is such that education in regular classes with the use of supplementary aids and

services cannot be achieved satisfactorily." *Id.* § 1412(a)(5).  This condition is known as the "least restrictive environment" requirement.  *See id.*

The IDEA's "primary vehicle" for ensuring an appropriate public education for students with disabilities is the "individualized education program" ("IEP").  *See Honig v. Doe*, 484 U.S. 305, 311 (1988); 20 U.S.C. § 1414(d).  Under the IDEA, a team including a student's parents, teachers, and school officials must meet at least once each year to discuss the student's performance, set goals, and identify services that the "local educational agency"—usually a school district—will provide to support the student in reaching those goals.  *See* 20 U.S.C. § 1414(d).  The IEP is the "written statement" of this assessment and plan.  *See id.* § 1414(d)(1)(A)(i).  The IEP team must develop an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex. Rel. Joseph F. v. Douglas Cty. Sch. Dist.* ("*Endrew F.*"), 580 U.S. 386, 399 (2017); *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley* ("*Rowley*")*,* 458 U.S. 176, 204 (1982) (The plan "should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.")  The IDEA requires that a State or local educational agency have an IEP in place "for each child with a disability in the agency's jurisdiction" at the beginning of each school year.  20 U.S.C. § 1414(d)(2)(A).

Because Congress recognized that parents and school officials would sometimes disagree about what services should be included in an IEP and how those services should be implemented, the IDEA guarantees certain "procedural safeguards" for students with disabilities and their parents.  *Id.* § 1412(a)(6).  First, a parent who is dissatisfied with their child's IEP may request an administrative due process hearing before an independent hearing officer.  20 U.S.C. § 1415(f)(1).  Second, if the parent is "aggrieved by" the hearing officer's determination, the

parent may seek judicial review in the district court.  20 U.S.C. § 1415(i)(2). The reviewing court, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

### B. Summary Judgment

"Although motions for review of an HOD are called motions for summary judgment, the Court does not follow 'a true summary judgment procedure.'" *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 128 (D.D.C. 2018) (quoting *L.R.L. ex rel. Lomax v. District of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012)); *cf.* Fed. R. Civ. P. 56.  Rather, in a civil action brought to challenge a Hearing Officer's determination pursuant to the IDEA, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive." *D.R. v. District of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009).  When neither party has requested that the court hear additional evidence, the motion for summary judgment is "the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997); *M G. v. District of Columbia,* 246 F. Supp. 3d 1, 8 (D.D.C. 2017) (citations omitted); *Thomas v. District of Columbia*, 407 F. Supp. 2d 102, 109 (D.D.C. 2005) (same).

The burden of proof falls upon the party challenging the hearing officer's decision, who must "at least take on the burden of persuading the court that the hearing officer was wrong." *Reid ex rel. Reid v. District of Columbia* ("*Reid* "), 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)).  A court reviewing an administrative IDEA determination "shall grant such relief as the court determines is appropriate," based upon "a preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C)(iii); *see also Rowley,* 458 U.S. at 205–206.

The preponderance of the evidence standard does not authorize unfettered *de novo review* by the court and is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206; *see also Endrew F.*, 580 U.S. at 399 ("Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal.")

As a general matter, factual findings from the administrative proceeding are to be considered *prima facie* correct. *District of Columbia v. Ramirez*, 377 F. Supp. 2d 63, 67 (D.D.C. 2005). Courts must give "due weight" to the administrative findings since "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Rowley*, 458 U.S. at 206-208 (quotation and internal quotation marks omitted). Furthermore, "[a] hearing officer's findings based on credibility determinations of live witness testimony are given particular deference where there is no supplementation of the record." *McAllister v. District of Columbia*, 45 F. Supp. 3d 72, 76 (D.D.C. 2014) (quotation and internal quotation marks omitted). Nevertheless, "a hearing decision 'without reasoned and specific findings deserves little deference.'" *Reid,* 401 F.3d at 521 (quoting *Kerkam v. McKenzie*, 931 F.2d 84, 87 (D.C. Cir. 1991)). Finally, where "a court upset[s] [a hearing] officer's decision," it must "explain its basis for doing so." *McKenzie*, 862 F.2d at 887.

### III. DISCUSSION

Hearing Officer Lazan's HOD addressed the four issues raised in the Plaintiffs' Due Process Complaint; however, in their Motion for Summary Judgment, Plaintiffs do not challenge the Hearing Officer's conclusions on the timeliness of DCPS's location of services offer, M.R.'s language classification, or the provision of speech-language services. Accordingly, because those three issues are uncontested by Plaintiffs, the Hearing Officer's

19

conclusions relating to those three issues are affirmed.  That leaves standing the denial of FAPE claim based on DCPS's alleged failure to propose a sufficient amount of specialized instruction, an appropriate peer group, and a specific reading intervention, and by DCPS designating a location of services that was alleged to be too large.  Those issues will be addressed herein.

Plaintiffs do attempt to raise a second contested issue in their Motion for Summary Judgment  - that FAPE was denied because the school failed to permit a meaningful observation of the proposed program at Jackson-Reed for either L.R. or M.R.'s educational consultant.  *See* Pls.' Mot., ECF No. 22, at 30-35.  In his February 2025 HOD, the Hearing Officer explained that "[t]hough the Parent did move for the right to an observation, and this motion was granted by written order dated November 5, 2024, FAPE claims corresponding to this motion were not raised in the due process complaint, which could have been amended to include such claims." AR1 at 29; *see District of Columbia v. Pearson*, 923 F. Supp. 2d 82, 87 (D.D.C. 2013) (indicating that the party requesting the due process hearing shall not be allowed to raise issues at the hearing that are not raised in the complaint, unless the other party agrees); *see also* 20 U.S.C. §1415(f)(3)(B).  Because this observation issue was not raised as part of the Plaintiffs' due process complaint, it was not considered by the Hearing Officer and this Court declines to consider it now.

Before beginning its analysis of the contested issues that are before this Court, the Court notes the Supreme Court's guidance in *Endrew F.*, 580 U.S. at 388, that parents can fairly expect school authorities to offer a "cogent and responsive explanation" for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of [her] circumstances."  *See* HOD, AR1 at 22 (citing *Endrew F.* and noting that the standard therein is "markedly more demanding that the 'merely more than de minimus' test applied by the Tenth

Circuit.")  As noted by Hearing Officer Lazan, the D.C. Circuit has found that *Endrew F.* "raised the bar on what counts as adequate education under the IDEA."  AR1 at 22 (citing *Z.B. v. District of Columbia*, 888 F.3d  515, 517 (D.C. Cir. 2018) (noting that the standard in *Endrew F.* was more demanding than the underlying district court's approach)).  In *Endrew F.*, however, the Supreme Court cautioned that its ruling "should not be mistaken for an invitation to the courts to substitute their own notions of sound educational policy for those of school authorities" to whose expertise and judgment deference should be paid.  *Endrew F.*, 580 U.S. at 404 (citation and internal quotation marks omitted).

The Court turns now turns to the Hearing Officer's consideration of  FAPE issues which are contested by Plaintiffs.

**A. Did DCPS deny the Student and the Parent a FAPE by failing to propose an appropriate IEP and placement and/or location of services for the 2024-2025 school years, including by failing to provide a sufficient amount of specialized instruction on his/her IEP, failing to propose placement in a program with an appropriate peer group, failing to propose an appropriate reading intervention, and proposing a placement and/or location of services that was too large?**

**1.  Amount of Specialized Education and Appropriate Peer Group**

In this case, the 2024 IEP that was finalized during a September 5, 2024 meeting included goals in reading, math, written expression, emotional, social and behavioral development, and motor skills/physical development, and it provided M.R. with twenty hours of specialized instruction outside general education, 180 minutes per month of occupational therapy, 180 minutes per month of behavioral support services, and one hour per week with a special education case manager.  September 2024 IEP, AR3 at 1, 4-46.[7]

---

[7] In sum, DCPS states that 2024 IEP, "which was based on a school week of 37.5 hours, provided 21.5 hours of services outside of a general education classroom" and M.R. "would be included with her general education peers for 16 hours per week."  Def.'s Cross-Mot., ECF No. 25, at 10; *see* AR3 at 51.

Plaintiffs assert that Hearing Officer Lazan's conclusion that it was reasonable for DCPS to propose that M.R. be educated with her general education peers for part of the school day is "not supported by the record." Pls. Mot, ECF No. 22, at 22. More specifically, Plaintiffs posit that M.R. requires all her instruction in special education classes, and they proffer that the Hearing Office failed to consider relevant evidence from witnesses who had observed M.R. in a classroom setting and/or opined on concerns that M.R. would be unable to "access the general education curriculum at the pace it is presented in general education classes without direct specialized instruction." *See* Pls.' Mot., ECF No. 22, at 24.

DCPS disagrees and urges the Court to uphold the Hearing Officer's decision. As a preliminary matter, DCPS notes that:

> The development of this IEP took place against the backdrop of a yearslong history of litigation between the parties, as recounted by the District in its opposition to Plaintiffs' motion for a preliminary injunction and the Court's order granting Plaintiffs' motion. *See* Def.'s Opp'n to Pls. Mot. for Prelim. Inj. at 4-11 [12]; June 3, 2025 Mem. Op. at 4-12 [19]. Over these various proceedings, two United States District Court judges, two magistrate judges, and two hearing officers in three administrative proceedings have concluded that M.R. does not require placement in a separate special education school such as Lab School to receive FAPE and multiple adjudicators have found that 20 hours of special education services per week delivered outside general education are sufficient to provide M.R. with a FAPE, yet M.R. has remained at the Lab School based on Plaintiffs' repeated invocation of the IDEA's stay-put provision over the years. *See id.*

Def.'s Cross-Mot., ECF No. 25, at 9, n.2.

The Court looks now to Hearing Officer Lazan's analysis of L.R.'s claim that M.R.'s IEP for the 2024-2025 School Year failed to offer enough specialized instruction and consideration of L.R.'s assertion that M.R. needed all her instruction in self-contained special education classes**,** in a small classroom setting. AR1 at 23. As a preliminary matter, in the HOD's "Findings of Fact" section, the Hearing Officer noted the following information:

> To implement the twenty hours per week of specialized instruction that the IEP required, Respondent recommended placement in the Specific Learning Supports ("SLS")

program. The SLS program is designed for students who have learning disabilities that affect their ability to access formalized classroom instruction. The program provides individual support to increase these students' access to the general curriculum. Students with low-average to average IQs attend these classes. Each class has a teacher and an aide for a maximum of about fifteen students. The program provides reading supports and whole-group and small-group instruction. The classroom aide is trained on how to facilitate small-group instruction.

AR1 at 21 (summarizing testimony by Ms. Millington).

Regarding the appropriate amount of specialized instruction, the Hearing Officer considered testimony by Ms. Dolginoff that M.R. had a "heavy level" of needs for academic work, and without support, M.R. would have issues "with the flow and pacing of instruction, vocabulary and completing the required research." *Id.* Hearing Officer Lazan considered also testimony by L.R. about M.R.'s slow processing speed and lack of retention of information, as well as testimony by Ms. Solomon that M.R.'s general education classes (such as art, music, physical education) have academic content and as such, M.R. would need slower instruction, repetition, and smaller special education classes in these subjects. *Id.* at 23, 25 (stressing the academic content of these classes); *but see* AR1 at 25 (noting that Ms. Barlow testified that the academic demands in these classes are much less stringent).

In contrast, the DCPS witnesses, Ms. Barlow and Ms. Easterly, focused on the need for the least restrictive environment. *Id.* at 23-24. Hearing Officer Lazan noted that "[while] not all students benefit from being around their general education peers, nothing in the record suggests that this Student is wary of general education peers or needs to be segregated . . . for the entire school day" and in fact, L.R. testified that, outside of school, M.R. is able to mix with typically developing peers. AR1 at 24. Furthermore, the Hearing Officer noted that, during her testimony, L.R. did not focus on the fact that M.R. would be required to take these classes such as art and music with general education students, but instead expressed concern with the school

size.  AR1 at 24.  Moreover, Hearing Officer Lazan explained that the record indicated that "instruction is differentiated in the classes at [Jackson-Reed], and that an aide goes to general education classes to provide assistance to SLS students."  AR1 at 25.[8]

Based on the record before him and the witnesses' testimony, Hearing Officer Lazan concluded that:

> [T]here is noting persuasive in the record to establish that any of the general education classes that the Student would take, including art, music, physical education, health, and foreign language, would be too fast-paced for the Student.  To the contrary, the record suggests that DCPS was reasonable to conclude that M.R., who is similar to the other students in the SLS program, according to the unrebutted testimony of [Ms. Easterly], would be able to manage in these classes.  The record indicates that the Student takes work very seriously, likes learning, and is respectful and compliant.  As [Ms. Solomon} herself pointed out, the Student's attitude is excellent and [she] is invested in success, looks to teachers for clarification, meets with teachers, and is much less frustrated that [she] ever was.  The record also indicates that the Student has done well in educational settings with typically developing peers outside of school.  The Student has taken classes in a pottery program for the past six years and has done so well that program staff have asked him/her to work there.  The Student has also worked at a day care center near [her] home, suggesting that [she] has at least partly overcome some of [her] executive functioning issues.

AR1 at 24-25.  Accordingly, "like the federal magistrate and federal judge in the earlier action," the Hearing Officer found that "it was reasonable for DCPS to propose twenty hours per week of specialized instruction for the Student" at Jackson-Reed,  AR1 at 25, and this Court agrees with the Hearing Officer's conclusion that DCPS's IEP providing 20 hours per week of specialized instruction for M.R. was not unreasonable.  The Court finds that the Hearing Officer's conclusion in this regard was well-reasoned and based upon the evidence that was presented, including witness testimony.

---

[8] In its Opposition, DCPS points to L.R.'s testimony that M.R. "would take elective classes and spend lunchtime with her non-disabled peers," and furthermore, L.R. was "aware that a social worker and occupational therapist would be available to M.R. in her elective classes at Jackson-Reed." Def.'s Cross-Mot., ECF No. 25, at 22-23 (internal citations omitted).

### a. Reliance on Evidence that was Not in the IEP

Plaintiffs contend that the Hearing Officer improperly relied on evidence that was not in M.R.'s IEP or shared with L.R., concerning the peer group in the Jackson-Reed SLS program, the availability of a professional to provide support to M.R. in elective classes, and the differentiated general education classes. *See* Pls.' Mot., ECF No. 22, at 27-29; Pl.'s Reply, ECF No. 28, at 5-7. The parties' arguments on these issues are set forth below, and for the reasons proffered by Defendant, the Court agrees that the Hearing Officer's consideration of evidence relating to these issues was appropriate.

### i. Peer Group

Regarding the peer group, Defendant argues that "Plaintiffs' administrative complaint generally claimed that DCPS 'failed to propose placement in a program with an appropriate peer group,'" AR3 at 160-161, and therefore, the burden was on DCPS to present evidence on the peer group. Def.'s Cross-Mot., ECF No. 25, at 40. As a preliminary matter, Defendant notes that, pursuant to the IDEA, an IEP is not required to address the peer group, but instead:

> [The IEP must address] the student's present levels of academic achievement and functional performance, a statement of measurable annual goals, a description of how the student's progress will be measured and when periodic progress reports will be provided, a statement of special education and related services and supplementary aids and services to be provided to the student, and a statement of program modifications.

Def.'s Cross-Mot., ECF No. 25, at 40; *see* 20 U.S.C. § 1414(d)(1)(A)(i)(I-IV); *see also* 71 Fed. Reg. 46, 665 (2006) (noting further that nothing in the IDEA requires an IEP to include specific methodologies, but an IEP team may determine whether a specific methodology will be included in a student's IEP). Moreover, Defendant asserts that if Plaintiffs had believed that M.R. required

25

placement with a specific peer group, this issue should have been raised when the IEP was developed, but it was not.  Def.'s Cross-Mot., ECF No. 25, at 40-41.

Defendant concludes, and this Court agrees, that Plaintiffs' peer group claim "is a substantive IEP claim couched as a challenge to the implementing school," which should be rejected.  *Id.* at 41; *see M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 245 (2d Cir. 2015) (rejecting a substantive attack on a student's IEP "couched as challenges to the adequacy of [the proposed school]").  The *M.O.* court found that challenges based on claims that the school and student-teacher ratio were too large and that the language-based program was inappropriate "d[id] not relate to [the proposed school's] capacity to implement the IEP" but instead related to "the appropriateness of the IEP's substantive recommendations."  *Id.*  Accordingly, the Second Circuit noted that because the substantive adequacy of the IEP must be determined by reference to the written IEP, the school district did not bear the burden to produce evidence in response to these types of challenges.  *Id.; see also Y.F. v. N.Y. City Dep't of Educ.*, No. 15 Civ. 6322 (LGS), 2015 WL 4622500, at *7 (S.D.N.Y. July 31, 2015) (rejecting plaintiffs' arguments that a proposed placement was inappropriate based on a school's curriculum and environment because nothing was contrary to a specific IEP requirement).

Furthermore, in the instant case, Defendant asserts that Plaintiffs have not demonstrated that M.R. requires a specific peer group to receive a FAPE nor do they "show how the classroom population in the SLS program at Jackson-Reed would be inappropriate or contrary to any specific requirements" of her IEP.  Def.'s Cross-Mot., ECF No. 25, at 41.  Where "there is no basis in the record for asserting that the intellectual mix of [the student's] peers in the two programs would be significantly different" and "no evidence to support the proposition that [the student] will be unable to obtain educational benefits," the challenge should be rejected.  *Knight*

26

*by Knight v District of Columbia*, 877 F.2d 1025, 1029 (D.C. Cir. 1989) (rejecting a placement challenge where plaintiffs argued that the Lab School was a superior placement to a D.C. public school).

### ii. Supports Available (Aide)

Plaintiffs contest the Hearing Officer's consideration of evidence that an aide was available at Jackson-Reed in elective general education classes, *see* Pls.' Mot., ECF No. 22, at 27-29. As a preliminary matter, Defendant contends that this availability of an aide does not mean that the aide would provide any direct services, but rather that M.R. was entitled to the accommodations and other classroom aids and services identified in her IEP in the general education setting. AR3 at 46-47 (listing other classroom aids and services). Def.'s Cross-Mot., ECF No. 25, at 42. Plaintiffs note however that even if an aide would not have provided any additional specialized instruction, "a second adult in a class drastically changes the proposed services, ration, and placement for a student." Pls.' Reply, ECF No. 28, at 6.

Plaintiffs suggest that this evidence about an aide was dispositive to the Hearing Officer's conclusion that M.R.'s IEP was appropriate, *see* Pls.' Mot., ECF No. 22, at 28-29. Defendant contends however that the Hearing Officer did not find that the IEP was inadequate, as drafted, nor did he find that it was appropriate only because more services could be offered than were called for in the IEP. Def.'s Cross-Mot., ECF No. 25, at 41-42. In contrast, Defendant proffers, and this Court agrees, that the Hearing Officer focused on Plaintiffs' concerns that the elective classes were too "fast-paced" and found that they were not borne out by the evidence before he noted that such concerns were overstated also because SLS students were also accompanied by an aide from the SLS program in general education classes. AR1 at 23-24.

Defendant references *Uhlenkamp v. District of Columbia*, No. 21-CV-2662-TNM-MJS, 2025 WL 2298659, at *11 (D.D.C. Aug. 8, 2025), where the district court noted that plaintiffs appeared to be "complaining about services that [the student] *did receive*" and that the D.C. Circuit had recently "rejected a claim based on an IEP's omission of certain services where the student [would] receive[ ] them all the same." Specifically, the *Uhlenkamp* court referenced *Edward M.R. v. District of Columbia,* 128 F.4th 290, 294 (D.C. Cir. 2025), where the D.C. Circuit opined that "the record shows that [student] *did* receive research-based instruction in speech and language, and in occupational therapy, even if his IEPs were silent on the matter. As such, his substantive rights weren't affected, and his claim fail[ed]." 2025 WL 2298659 at *11. Similarly, in this case, while the IEP did not specify that an aide would accompany M.R. from the SLS program to general education classes – leaving aside that this service may have fallen generally within the context of classroom aids and services – M.R.'s substantive rights were not affected by this omission in the IEP (which was not deficient), and evidence about the provision of this service need not have been completely ignored by the Hearing Officer.

### iii. Differentiated General Education Classes

Defendant proffers that the "only reason [ ] information [about differentiated education classes] came to light is because Plaintiffs' counsel elicited testimony during the cross-examination of Ms. Easterly" when he was trying to show that M.R. would not receive specialized instruction in general education classes at Jackson-Reed. Def.'s Cross-Mot., ECF No 25, at 42 (citing AR4 at 680 (indicating that a student covered by the SLS program <u>can elect</u> to take classes with a SPED teacher and general education teacher present). Defendant argues that the Hearing Officer was not obligated to disregard this testimony "simply because the

information was not included in the IEP or because the information was not previously provided to Plaintiffs" as Plaintiffs "opened the door to this testimony." *Id.* at 43.

Plaintiffs asserts however that the Hearing Officer must "judge the IEP as of the time it was created and not consider information about the proposal which has not been shared with the parent." Pls.' Mot., ECF No. 22, at 27-28 (citing several cases); *see also Z.B.*, 888 F.3d at 524 (finding that "parents are only promised the support articulated in the IEP" and that "[t]he IDEA does not permit us to sustain an inadequate IEP because the school system theoretically might bolster it.") Defendant asserts that while Plaintiff relies on several cases for the proposition that the Hearing Officer should not have considered evidence that was not included in the IEP, these four cases are factually distinguishable. First, in *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 71-72 (D.D.C. 2010), the court reversed a hearing officer's decision where the hearing officer erroneously rehabilitated a deficient IEP based on services that "*could have been* provided by March instead of considering what services were actually called for by the IEP or adequately discussed at the IEP meeting." Defendant contends accurately that the IEP here is not "internally contradictory" nor did Plaintiffs claim that there were any procedural irregularities, as in *N.S.*, and furthermore, Plaintiffs here were "advised on the availability of additional supports available in general education classes." Def.'s Cross-Mot., ECF No. 35, at 44; see AR4 at 363-364 (testimony of L.R. acknowledging that M.R. would get additional support from a social worker and occupational therapist and that M.R's SPED teacher could consult with any elective teacher or staff member to assist M.R.).

Second, and like *N.S.*, in *Alfono v. District of Columbia,* 422 F. Supp. 2d 1, 7-8 (D.D.C. 2006), the hearing officer's decision that the IEP was appropriate was reversed because the IEP was <u>incomplete</u> and did not include goals and objectives or a means for measuring the student's

progress.  In contrast, here, the IEP was procedurally compliant.  DCPS asserts, and this Court agrees, that at the due process hearing, DCPS proffered additional information about the implementation of the IEP at Jackson-Reed, but that information "either had nothing to do with the services included in the IEP, such as M.R.'s potential classroom peers," or it was "similar to information already known to the Plaintiffs, such as information about the supports available to M. R. in her electives."  Def.'s Cross-Mot., ECF No. 25, at 44;  *compare K.R. ex rel. Matthew R. v. N.Y.C. Dep't of Educ.*, 107 F. Supp. 3d 295, 302 (S.D.N.Y. 2015)) (finding that hearing officers and courts may consider "testimony explaining how the IEP would be implemented.") *with N.S.*, 709 F. Supp. 2d at 71-72 (finding that the school district could not bolster an "incomplete" and internally inconsistent IEP via testimony about additional services available at the proposed school).

Third, in *A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 682 (4th Cir. 2007), the Fourth Circuit found that the IEP was inappropriate because it did not identify a specific private school for the student.  Finally, in *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764-768 (6th Cir. 2001), the Sixth Circuit reversed the district court's denial of a request for reimbursement where the school had never convened an IEP meeting and failed to provide a final IEP to the parents, nor did the draft IEP provide a FAPE.  The Court agrees that these cases cited by Plaintiffs and rebutted by Defendant are inapposite as the IEP in this case was appropriate, based on its own written terms, and the Hearing Officer did not err in considering additional evidence as to how the IEP could be implemented, such as the [cross-examination] testimony by Ms. Easterly on differentiated general education classes.

In sum, the Court reiterates that, in making his determination that there was no denial of FAPE – when considering Plaintiffs' challenges based on the amount of specialized education

and an appropriate peer group – the Hearing Officer carefully considered the record in this case, including the terms of the IEP and the testimony of witnesses at the due process hearing (some of which pertained to implementation of the IEP). Furthermore, Hearing Officer Lazan detailed his reasoning in his HOD, and as such, the Court declines to overturn the Hearing Officer's decision regarding these issues.

### 2. Reading Intervention

L.R. asserted that the IEP did not provide appropriate reading intervention for M.R. and argued that "nothing had changed since the rulings of the federal magistrate and the federal court in the earlier action" when the case was remanded to the hearing officer to consider that the recommended program "did not address the Student's issues with phonetic awareness by including a phonetic awareness goal" and because the hearing officer had "failed to adequately consider Ms. Solomon's testimony" about the instruction that M.R. was receiving. HOD, AR1 at 26.

Hearing Officer Lazan disagreed, however, and he opined that M.R.'s issues "have changed since then" as there was no claim mentioned in Plaintiffs' brief that the IEP did not address M.R.'s phonetic awareness issues. *Id.* And, in fact, Plaintiffs' witness, Ms. Dolginoff, testified that M.R.'s reading classes "focused on fluency and decoding, not phonetic awareness." *Id.* While L.R. suggested also that DCPS should have included a specific reading methodology in the IEP, the Hearing Officer noted that "courts have held that DCPS is not ordinarily required" to do so (noting that this point was made in the earlier case involving these parties). *See id.* (Hearing Office Lazan discussing Magistrate Judge Meriweather's belief "that the IEP and related Prior Written Notice ("PWN") offered enough specificity"); *see also Clark v. District of Columbia*, No. 21cv1541 (TSC), 2023 WL 2733724, at *3 (D.D.C. Mar. 31, 2023) (DCPS was

not required to list in the IEP the specific type of reading interventions that a student would receive).

Furthermore, in this case, DCPS <u>did</u> add specific reading interventions to the "Other Classroom Aids and Services" section of the IEP, suggesting the use of an evidence-based Orton-Gillingham approach, with which M.R. had made progress previously at the Lab School. *See* September 2024 IEP, AR3 at 47.[9]  Hearing Officer Lazan noted however that, at that point, M.R.'s reading progress at the Lab School had been mixed.  This statement was based on testimony by Plaintiffs' witnesses about M.R.'s low statistical rankings for reading and Ms. Solomon's testimony that she was not sure if M.R.'s reading scores would ever be much higher. AR1 at 27.

Considering the record evidence and testimony of Plaintiffs' witnesses and the applicable case law, the Hearing Officer concluded that DCPS's failure to include a specific reading methodology was not a denial of FAPE, and the Court finds this conclusion is well-supported and thoroughly explained.

### 3. Size of Proposed Location of Services

A school district "must place the student in a setting that is capable of fulfilling the student's IEP." *Johnson v. District of Columbia*, 962 F. Supp. 2d 263, 267 (D.D.C. 2013); *see also O.O. ex rel. Pabo v. District of Columbia*, 573 F. Supp. 2d 41, 53 (D.D.C. 2008) (same). DCPS selected Jackson-Reed as the location of services to implement M.R.'s September 5, 2024 IEP, and DCPS contends that Plaintiffs have not demonstrated that Jackson-Reed is

---

[9] DCPS asserts that "[t]he IEP also included numerous classroom aids and services, such as repetition of oral and written instructions, extra time for processing information, multi-sensory visualization, and text to speech in an online fluency program, which specifically addressed M.R.'s reading deficits."  Def.'s Cross-Mot., ECF No. 25, at 29; see AR3 at 47.

inappropriate.   Def.'s Cross-Mot., ECF No. 25, at 30; *id.* at 31 (citing testimony by Ms. Millington about the SLS program and testimony by Ms. Barlow about the reading programs which incorporate the Orton-Gillingham approach).

L.R. alleged however that Jackson-Reed was too big for M.R. to travel through.  AR1 at 28.  The Hearing Officer noted that while this was the first issue mentioned by the Parent during her testimony,  Plaintiffs' education consultant, Ms. Solomon, did not emphasize this issue in her testimony, nor was it mentioned in Plaintiffs' closing memorandum.   AR1 at 28. Furthermore, Hearing Officer Lazan credited the testimony of  DCPS's witnesses, Ms. Easterly and Ms. Millington, who described the SLS program, including the peer group, available electives, and provision of supports in the general education setting, and Jackson-Reed's ability to implement the IEP.  *Id.*  Ms. Millington indicated that the SLS program had classes with students in the same grade and academic classes had two adults and no more than twelve students.  AR1 at 28.  She testified also that aides traveled with the SLS students to electives and related services can be provided in the electives, if necessary.  *Id.*

Finally, Hearing Officer Lazan proffered that his review of caselaw "provide[d] little support for parents who make tuition reimbursement claims based on allegations that the proposed school's physical plant is too large for a student." AR1 at 28.  He noted that "IDEA claims are ordinarily based on inadequacies in the IEP, since the IEP is the 'centerpiece' of IDEA.  AR1 at 28 (citing *Honig v. Doe*, 484 U.S. 305, 311).  Considering the evidence that the IEP could be fulfilled at Jackson-Reed,  the Hearing Officer found that the size of the school did not constitute a denial of FAPE, and this Court agrees with the sufficiency of the Hearing Officer's conclusion on this issue.

In sum, the Hearing Officer analyzed Plaintiffs' objections to M.R.'s IEP – in the context of DCPS's proposed location of service, Jackson-Reed High School – and the Hearing Officer found no denial of FAPE.  That conclusion is affirmed by this Court, and the Court turns now to Plaintiffs' general objections regarding the way the Hearing Officer made his determination.

### 4. Plaintiffs' Remaining Arguments

Plaintiffs argue that even while "DCPS witnesses uniformly failed to apply their expertise to M.R.'s education and demonstrated almost no knowledge of her or her needs, . . . the Hearing Officer relied upon their testimony while dismissing the testimony of the parent's witnesses" and in this way he "excus[ed] the school system's failure to provide a cogent or responsive explanation for M.R.'s proposed IEP and placement."  Pls.' Mot., ECF No. 22, at 16.  Plaintiffs assert that "the difference in actual knowledge of M.R. exhibited [by DCPS's witnesses] at [the] hearing was stark," insofar as the DCPS witnesses "did not know her at all."  *See* Pls. Mot., ECF No. 22, at 19.  This Court is unsure if Plaintiffs are challenging the Hearing Officer's credibility determinations and/or his weighing of the evidence, but finds that, in either case, as explained below, Plaintiffs' arguments fail.

### a. Credibility

First, regarding credibility, in his HOD, Hearing Officer Lazan plainly stated that he did consider L.R.'s contention that her witnesses should be credited because "they were extremely knowledgeable about the Student, underscoring that [Ms. Solomon] has worked with the Student since 2016."  AR1 at 28.  The Hearing Officer noted however that Plaintiffs did not proffer any of M.R.'s teachers as witnesses, nor did DCPS "present a witness who has taught the Student" but that DCPS has not had an opportunity to teach the Student for years.  *Id.*  Hearing Officer Lazan noted that one of Plaintiff's witnesses, Ms. Kunz, instructed M.R. once a week in a pass-

34

fail class called "freshman seminar" and on the DCPS side, their witness, Ms. Green, conducted a thorough evaluation of M.R. in 2023, including observations and interviews with her teachers at the Lab School.   AR1 at 28-29; *see also* AR1 at 11-13 (detailing Ms. Green's evaluation of M.R.).   Other witnesses testified based on their areas of expertise.   For example, Ms. Easterly opined on the development of an appropriate IEP, *see* AR1 at 18-19 (discussing Ms. Easterly's testimony about M.R.'s IEP, including goals therein and the rationale behind those goals),[10] and Ms. Millington testified about implementation of the twenty hours of specialized instruction, *see* AR1 at 20-21 (discussing Ms. Millington's testimony about the SLS program).

Second, there is no indication in the HOD that the Hearing Officer's decision was affected by an assessment that any of Plaintiffs' witnesses were not believable.   Rather, on the issues before this Court, the Hearing Officer considered the testimony of several witnesses, from both sides, relative to their qualifications/expertise, and in combination with record evidence regarding M.R.'s characteristics, difficulties, and progress.   More specifically,  with regard to the amount of specialized instruction and appropriate peer group, the Court notes that much of the testimony proffered by DCPS witnesses (and referenced by the Hearing Officer) related to the IDEA's requirements of the Least Restrictive Environment ("LRE"), the academic content of "specials", the SLS program, and the way in which specialized instruction would be effectuated, all topics on which DCPS witnesses were appropriately versed.   Hearing Officer

---

[10] DCPS indicated that, "on June 26, 2024, the Lab School provided M.R.'s 2023-2024 educational records to DCPS, which it used to develop the September 5, 2024 IEP." Def.'s Cross-Mot., ECF No. 25, at 29 (internal citation omitted).  More specifically, "DCPS relied on a September 2023 Measure of Academic Progress (MAP) in reading and math, a 2024 Lab School educational plan, M.R.'s 2023-2024 transcript, a March 2024 psychological progress report, input from M.R.'s occupational therapist, and a DCPS February 2023 psychological evaluation to develop the IEP's present levels of performance." *Id.*  DCPS program specialist Ms. Easterly reviewed the educational records that the Lab School provided to DCPS. *Id.*

Lazan did however also discuss the testimony of Plaintiffs' witnesses, which was focused more on M.R.'s capabilities and challenges, as well as Ms. Solomon's focus on the academic content of "specials," where she referenced District of Columbia curriculum standards.   Regarding the issue of DCPS's alleged failure to include a specific reading methodology, the Court notes that the Hearing Officer cited solely to Plaintiffs' witnesses, and he credited their testimony as partial support for his conclusion.   Finally, on the issue of Jackson-Reed school size, the Hearing Officer relied on DCPS witnesses, who described Jackson-Reed and the SLS program.

Third, even if the Hearing Officer had found Plaintiffs' experts not credible, Plaintiffs have provided no basis to discredit any such determination.  "[A] District Court must accept the [hearing officer's] credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion."  *Moradnejad v. District of Columbia*, 177 F. Supp. 3d 260, 281 (D.D.C. 2016) (quotation omitted).  "Where the Hearing Officer's findings are based on credibility determinations of live witness testimony, as they are here, and there is no supplementation of the record before the Court, particular deference is due to the Hearing Officer's decision."  *R.D. ex rel. Kareem v. District of Columbia*, 374 F. Supp. 2d 84, 89-90 (D.D.C. 2005).   In this case, Plaintiffs do not proffer "non-testimonial, extrinsic" or "supplemental" evidence to support their position and accordingly, the Court defers to the Hearing Officer's credibility determinations.

### b. Weight of the Evidence

If Plaintiffs are questioning the way in which the Hearing Officer weighed the evidence, *see* Pls.' Mot., ECF No. 22, at 22-26 (highlighting testimony that supports their argument, some of which was mentioned in the HOD), that argument fails also.  As the "trier of fact at the due process hearing . . . it was [Hearing Officer Lazan's] responsibility to determine how much

weight to give the evidence." *A.I. ex rel. Iapalucci v. District of Columbia*, 402 F. Supp. 2d 152, 170 (D.D.C. 2005); *see also Garris v. District of Columbia*, 210 F. Supp. 3d 187, 190 (D.D.C. 2016) (At bottom . . . these objections are about how the Hearing Officer weighed the evidence. . . That Plaintiffs draw a different conclusion from that evidence does not make the Hearing Officer's alternative conclusion improper.")  Nor is a hearing officer required to "offer a detailed explanation for why he gave more weight to Defendants' evidence than to Plaintiffs' evidence."  *Iapalucci*, 402 F. Supp. 2d at 170.

The Court finds that, in the HOD, the Hearing Officer discussed the opinions and observations of witnesses from both sides, indicated where testimony was unrebutted or seemingly inconsistent, and he supported his conclusions with references to the record, regulations, and case law.  Accordingly, Plaintiffs' reliance on *M.O. v. District of Columbia*, 20 F. Supp. 3d 31, 41 (D.D.C. 2013) – where the court found that the hearing officer's decision lacked sufficiently detailed reasoning – is misplaced.  In *M.O.*, *id.*, the court found that, despite the parents' presentation of evidence, assessments, and testimony of various experts, the hearing officer's determination contained "no discussion of the adequacy of the District's consideration of the recommendations, or why the District's review of the evaluations was credited over those of the plaintiffs' witnesses."  Courts need not defer to a hearing officer's decision that lacks reasoned and specific findings.  *McNeil v. D.C.*, 217 F. Supp. 3d 107, 114 (D.D.C. 2016).  The Court considers the *M.O.* case inapposite as the HOD here includes "sufficiently reasoned, specific findings," supported by the record, to warrant deference.  *See*, *e.g.*, *Gregory-Rivas v. District of Columbia*, 577 F. Supp. 2d 4, 8 (D.D.C. 2008). In the instance case, the Court finds that the Hearing Officer "reached reasonable conclusions based on the totality of the record before him, including the testimony of both parties' witnesses."  *A.D. v. District of Columbia*,

Civil Action No. 20-cv-2765 (BAH), 2022 WL 683570, at *11 (D.D.C. Dec. 8, 2020) (citation omitted). The Court concludes therefore that Plaintiffs' challenges to witness credibility and/or the Hearing Officer's weighing of the evidence are without merit. Accordingly, this Court gives "'due weight' to the administrative proceedings and afford[s] [appropriate] deference to the expertise of the hearing officer and school officials responsible for the child's education." *Long v. D.C.*, 780 F. Supp. 2d 49, 59 (D.D.C. 2011).

For the reasons explained in detail herein, this Court rejects Plaintiffs' challenges to the HOD and affirms the Hearing Officer's conclusion that "DCPS offered the Student a FAPE during the 2024-2025 school year" (HOD, AR1 at 32). As such, Plaintiffs' Motion for Summary Judgment shall be denied, and Defendant's Cross-Motion shall be granted. A separate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE